CLARA SCHLEUSENER, EXECUTRIX OF THE LAST WILL AND TESTAMENT OF EDWARD SCHLEUSENER, DECEASED, APPELLEE, v. NEBRASKA TRACTOR & EQUIPMENT COMPANY, A CORPORATION, APPELLANT, IMPLEADED WITH CUMING COUNTY, NEBRASKA, A POLITICAL SUBDIVISION, APPELLEE.

193 N. W. 2d 438

Filed January 7, 1972. No. 37970.

Fraser, Stryker, Marshall & Veach, for appellant.

M. J. Bruckner of Marti, O'Gara, Dalton & Bruckner, for appellee Schleusener.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SPENCER, J.

This is an action for the wrongful death of Edward Schleusener while a passenger in an automobile owned and operated by an employee of the Nebraska Tractor & Equipment Company. Deceased died from carbon monoxide poisoning on March 22 or 23, 1966, while an occupant of a stalled automobile, during a violent snow storm. Judgment was rendered for the plaintiff executrix. We reverse.

On March 22, 1966, Joseph Grasso and Charles W. Martin, employees of the Nebraska Tractor & Equipment Company transported the deceased and five other members of the board of county commissioners of Cuming County to Grand Island to inspect a road maintainer and a tractor for which the board was negotiating. The

deceased and two of the other commissioners rode with Martin in his 1966 Buick automobile which it is stipulated was being operated in the business of the company. The weather on the morning of March 22, 1966, was mild, "like a spring day," although there was some light rain or mist in the air. The occupants of both cars wore light clothing. There was no indication of a serious weather change. They reached Grand Island shortly before noon.

Both automobiles left Grand Island sometime before 2 p.m., with the Grasso car in the lead. The parties were headed for Dodge where they were to discuss the transaction. It was then the intention to drop off one of the commissioners at that point, with the others going on to West Point. The weather was then cloudy and rainy. The two vehicles proceeded east on U. S. Highway No. 30 to Central City, then north from Central City on State Highway No. 14 to Albion, where they turned east onto State Highway No. 91. The rain had turned to snow, and it was getting slushy. The snow had gotten heavier as they approached Albion and Grasso reduced the speed of his vehicle to 40 miles per hour. After passing Albion the cars passed through or around the towns of Lindsay, Humphrey, Creston, Leigh, and Clarkson. By the time they passed Clarkson the snow was very heavy and the wind, which had suddenly turned to the northwest, was increasing in velocity.

About 15 rods west of Clarkson a truck forced the Grasso car off the road. It was then approximately 4:30 p.m. The Martin car pulled up alongside. Grasso told Martin that he would be able to get his car going again, and to go ahead. Martin pulled out. A truck came by, and then Grasso proceeded forward. Grasso and the occupants of his car never saw the Martin car again. In a very short period the snow got heavier, visibility became poor, and the Grasso motor started to sputter and miss. Grasso drove approximately another mile and the car stopped. It was then about 5:05 p.m. Grasso

testified that the storm by then had suddenly accelerated in intensity. "When I first pulled off it just seemed like it was a matter of a few minutes and everything zeroed in." The occupants of the Grasso car testified that the weather was real bad; they couldn't see; and they decided to stay in the car. Grasso tried to start his motor from time to time, but was unable to do so. The occupants of the Grasso car remained in the car until they were found about 11 a.m. the next morning.

The Martin car was found on the south side of Highway No. 91 at approximately 2 p.m., March 23, with its front wheels on the highway and its rear wheels off the road. It was about 2½ miles east of Howells and about 3½ miles west of Dodge. It was stipulated the four occupants of the car were dead and had died from carbon monoxide poisoning. The trunk lid was open and sprung, so that it could not be closed. The right front vent of the car was open enough to permit one of the witnesses to put his fingers in it. The car was running, the heater was on, and the radio was playing. The exact time that the Buick reached the point where it was found is not known, but from the record we assume it was before 6 p.m. The Martin car was found less than 10 miles from where the Grasso car stopped.

The evidence is fairly conclusive that none of the parties had heard storm warnings of any kind, and that the storm came up suddenly and was probably the worst storm some of them could remember. A farmer from the Howells vicinity testified as follows: "Q. How do you recall this storm, when did it come up and what did you notice? A. Well, for one thing, it came up so quick that it never give nobody a chance to realize what was really going to happen because we have never had a storm like this for many years, as long as I can remember I have never seen one that came up that quick."

It was stipulated "that the Buick Wildcat automobile owned and operated by Charles W. Martin, within the scope of his employment, and while on company busi-

ness for the Defendant on March 22, 1966, was in all ways in a good and operable condition with no defects, with the understanding, however, that the day following this tragedy, as was testified to by various witnesses, the trunk lid was open and sprung, open to the degree that it took three men, as testified to by one of the witnesses, to try and force it down."

Plaintiff's expert witness, an assistant professor of mechanical engineering at the University of Minnesota, in response to a hypothetical question as to whether the carbon monoxide would enter the trunk, testified as follows: "It is my opinion that carbon monoxide from the—being discharged from the tailpipe could get in and would get in to the vehicle by means of getting into the trunk from underneath and inside of the bumper and up over into the trunk area where it could mix with the air and be forced forward or would simply by mixing with the air flow forward and into the occupied area of the vehicle, there being no complete restriction preventing that."

On cross-examination, plaintiff's expert testified as follows: "Q. And that is shown in these photographic exhibits that I have just shown you and specifically, because it appears so clearly in Exhibit 7, being color, if the wind came from the northwest across the rear end of that car with the trunk lid up and the exhaust pipe down here in the lower right-hand corner, couldn't it very well blow it right on around the side of the car? A. Some of the exhaust would probably go around the side, but some of it also accumulates underneath the bumper and comes up and around and across the bumper here and spills over into the trunk."

Defendant sets out seven assignments of error. We consider only the one involving the overruling of defendant's motion for judgment notwithstanding the verdict.

In Corbitt v. Omaha Transit Co., 162 Neb. 598, 77 N. W. 2d 144, we held: "In a case where a motion has been

made at the close of all of the evidence for a directed verdict, which motion should have been sustained but was overruled and the case was submitted to a jury which returned a verdict contrary to the motion, and a motion for judgment notwithstanding the verdict is duly filed, it is the duty of the court to sustain the motion and render judgment in accordance with the motion for a directed verdict."

We examine the record herein pursuant to the general rule applicable to such motions enunciated in Corbitt v. Omaha Transit Co., *supra:* "A motion for a directed verdict must for the purpose of decision thereon be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the evidence."

Before the plaintiff can recover herein she must prove that the defendant was negligent in one or more of the particulars claimed by her, and that such negligence was a proximate or contributing cause of the death of the deceased.

We have set out enough of the evidence to determine if plaintiff proved actionable negligence by a preponderance of the evidence. Plaintiff alleges that Martin was negligent in failing to stop his vehicle in a place of safety when he knew or in the exercise of reasonable care should have known that the severe weather conditions presented an unreasonable risk of injury or harm to the passengers.

As we view the record, it is conclusive that the storm suddenly accelerated in intensity. The last time the Martin car was seen was when Martin stopped to see if Grasso needed help and was told to go on. What happened thereafter must be left entirely to conjecture because there were no eyewitnesses and the actions of Martin and the occupants of his car are unknown. What

can we say Martin did or failed to do that a reasonably prudent person would or would not have done? From hindsight, we may say the occupants of his car would not have died if he had driven into Howells and sought shelter. Yet the Grasso car stalled and its occupants remained in the car and survived. There were also other vehicles caught in the storm without the fatal result experienced by the occupants of the Martin car. The deaths were not caused by exposure but by carbon monoxide poisoning.

Is the evidence sufficient to permit a jury to find that a reasonably prudent person would have stopped before the point at which the Martin car was stopped or, more important, that the decision to attempt to reach Dodge was solely that of Martin? The car, which was headed for Dodge, Nebraska, was found 3½ miles from that point. While the car passed within a mile of the town of Howells, 2½ miles from which it was found, and possibly might have been driven into that town, we cannot say that Martin was negligent in failing to do so. The occupants of his car were county commissioners of Cuming County. They undoubtedly were much more familiar than he with the territory through which they were passing. If we were to indulge in speculation, which we would do to find a jury question on this issue, it would be just as reasonable to believe that the occupants of the car were encouraging Martin to drive forward on the main highway rather than to take the spur road into Howells.

The cause of death was carbon monoxide poisoning. How, if at all, was Martin responsible for the death? Plaintiff's main claim of negligence is that Martin was negligent in operating his automobile with the trunk lid up after it became stalled. There is no evidence as to how the trunk was opened, by whom, or when. The evidence is conclusive that when the car was found the trunk lid was sprung and could not be closed. However, it is not the opening of the trunk but the running of the

motor with the trunk lid open which plaintiff asserts as negligence. The vehicle was stopped or stuck at the point where found; the occupants were dressed in light clothing; and the storm was such that it would not have been practical for the occupants to leave the car. The car heater and the radio were on, and the motor was running at the time the car was found. As to whether it had been running continuously, we have no way of knowing. The evidence is undisputed that one of the car vents was open sufficiently to permit a witness to put his fingers through it.

It is the plaintiff's theory that the exhaust fumes from the car curved up into the open trunk and then seeped into the automobile, and that Martin as the owner and driver should have anticipated this result. In attempting to reconstruct the deaths 5 years later, where no tests were performed at the time, we can only theorize as to how the carbon monoxide fumes entered the car. Although plaintiff's expert, who inspected the car 5 years later, and studied some photographs of it, was of the opinion that if the trunk lid had been closed there would have been little likelihood of carbon monoxide poisoning, he did not examine the muffler system or run the engine, and admitted he had no way of knowing the condition of the system at the time of the deaths. It was stipulated that the car was in a good and operable condition with no defects on March 22, 1966.

Exhibits 5 and 7, which are photographs of the rear of the Martin car when found, would indicate a buildup of snow which covered the rear bumper of the car. How soon this happened after the car was stalled, or with relation to the time the trunk was opened or the time of the deaths of all the occupants, is of course not known, and any conclusions we might draw would be pure speculation. From the photographs we could surmise that after the buildup of the snow, the carbon monoxide came out the two ends of the rear bumper or passed under the car to the front end which was partly open.

However, if we assume that carbon monoxide coming through the trunk was the method by which the deceased was asphyxiated, we still have the question as to whether Martin's failure to realize this possibility would be sufficient to charge him with negligence. We do not believe plaintiff met her burden of proving that some negligence of Martin was the cause of decedent's death.

Defendant's motion for judgment notwithstanding the verdict should have been sustained. The judgment is reversed and the cause remanded with directions to dismiss.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.

CLINTON, J., participating on briefs.